**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
---------------------------------------------------------X

In re:

|  |  |
|---|---|
|  | Chapter 7 |
| BAR SAN CONTRACTORS, INC. | Case No. 04-12362 (MBK) |
| Debtor. |  |
| DONALD BIASE, Chapter 7 Trustee for the Estate of Bar San Contractors, Inc. | Adversary No. 05-6103 (MBK) |
| Plaintiff, |  |
| -v- |  |
| PINEBROOK FUNDING, LLC, |  |
| Defendant. |  |

---------------------------------------------------------X
**OPINION**

**APPEARANCES:**

Andrew C. Gold, Esq.
John August. Esq.
Herrick, Feinstein LLP
One Gateway Center
Newark, NJ 07102
Attorneys for Pinebrook Funding, LLC

Sam Della Fera, Jr., Esq.
Henry M. Karwowski, Esq.
Trenk, DiPasquale, Webster, Della Fera & Sodono, PC
100 Executive Drive, Suite 100
West Orange, NJ 07052
Attorneys for Donald Biase, Chapter 7 Trustee

---

**MICHAEL B. KAPLAN, U.S.B.J.**

I.   **INTRODUCTION**

Defendant, Pinebrook Funding, LLC ("Defendant") and Bar San Contractors, Inc. ("Debtor") entered into a Master Purchase and Sale Agreement ("Agreement") on August 22, 2003.  Pursuant to the Agreement, Defendant purchased, or "factored," Debtor's accounts receivable (each purchased receivable is hereinafter also referred to as a "Factored Account" and, collectively, the "Factored Accounts").  The Debtor filed a petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on January 23, 2004 (the "Petition Date").  After the Petition Date, Defendant continued to factor the Debtor's receivables under the Sale Agreement pursuant to an Order of the Bankruptcy Court, dated May 18, 2004 ("Post-Petition Financing Order").  Subsequently, a Chapter 11 Trustee was appointed and, thereafter, the case was converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code.

On November 10, 2005, Donald V. Biase, Chapter 7 Trustee (the "Trustee"), filed against the Defendant a Verified Complaint to Avoid and Recover Preferential Transfers and Fraudulent Transfers and For Injunctive and Other Relief.  On January 26, 2007, the Trustee filed an Amended Complaint.  At the heart of the litigation is the Trustee's contention that the factoring arrangement between the Debtor and Defendant reflected a loan transaction, rather than an outright sale of receivables, thus giving rise to various Trustee actions predicated upon Defendant's status as an unsecured creditor.

On February 7, 2007, Defendant filed a Motion For Partial Summary Judgment (i) declaring and adjudging that the transaction between Defendant and Debtor under a certain Agreement constituted a sale; and (ii) dismissing certain Counts in the Trustee's Amended Complaint.  Thereafter, the Trustee cross-moved for partial summary judgment declaring and

adjudging that the transaction between Defendant and Debtor under the Agreement constituted a loan. At oral argument on this matter, both parties stipulated that there were no material issues of fact, or additional evidence to be adduced through discovery or trial, which bore upon the issue or were necessary for the Court to decide the cross-motions for summary judgment. For the reasons which follow, this Court determines that the factoring transactions at issue constituted sales of accounts receivable, as opposed to a secured loan, thus entitling Defendant to partial summary judgment as set forth herein.

## II.    JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and the Standing Order of Reference issued by the United States District Court for the District of New Jersey on July 23, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F), (H) and (O). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

## III.   UNDISPUTED FACTS [1] AND PROCEDURAL HISTORY

1.    Before its liquidation, Debtor was engaged in the business of construction contracting and performed excavation and installation services on private and public utility projects for companies, which included Verizon and Public Service Electric & Gas ("PSE&G").

2.    On August 22, 2003, Defendant and Debtor executed a Master Purchase and Sale Agreement (the "Agreement") pursuant to which Defendant began purchasing Debtor's

---

[1] The Court has adopted and incorporated in its Opinion certain non-controverted facts set forth in the certifications of Sam Della Fera, Jr., Esq., John M. August, Esq., and Donna Brewer Rossi and Exhibits annexed thereto, filed by the parties in support of their respective cross-motions.

receivables. Under the terms of the Agreement, title to each of the Factored Accounts vested in Defendant.

     3.    The Agreement required Defendant to initially advance the amount of 70% of the account to the Debtor at the time of purchase. The Debtor provided Defendant with an assignment, invoice, or similar proof of the amount due from the account debtor in connection with each purchase. Either the Debtor or the Defendant then forwarded a letter notifying the account debtor of the sale and directing the account debtor to pay Defendant directly.

     4.    After it collected an account receivable, Defendant placed 30% of the receivable, minus its fee,[2] into a reserve account (the "Reserve"). Defendant would then return the reserve or, at Debtor's instruction and sole discretion, apply it to another unpaid Factored Account in order to stop the accrual of fees on that Factored Account.

     5.    The Agreement additionally provided, in pertinent part, that:

        A.    Defendant was not obligated to purchase any account receivable from Debtor and could, "in its sole discretion with or without cause, for any reason or for no reason whatsoever," reject any account receivable.

        B.    Debtor was required to represent and warrant that, to the best of its knowledge, each of its customers, or account debtors, was solvent and that it would continue to provide to Defendant all documents and information available concerning the business and creditworthiness of such customers. Also, Debtor was required to represent that each account receivable represented an accurate and undisputed statement of indebtedness owed to Debtor for a sum certain without offset, defense, or counterclaim.

        C.    For each account sold, Debtor sold, transferred, and assigned all of its right, title and interest in the Factored Account to Defendant.

---

[2] Attachment "A" to the Agreement, sets forth a sliding scale for fees charged by Defendant, ranging from 4% to 25% of the account's face value, depending upon the length of time for collection.

D.  All payments from account debtors were solely Defendant's property. In furtherance of this provision, Debtor provided Defendant with a power of attorney which gave it the right to endorse Debtor's name on checks forwarded to Defendant on Factored Accounts, and to deposit same into Defendant's account.

E.  All payments which the Debtor received from an account debtor on a Factored Account were held in trust for Defendant and had to be immediately turned over.

F.  Defendant accepted the risk of non-payment by the account debtor because of insolvency. Defendant did not assume other risks with respect to the Factored Accounts, such as the risk of a dispute over the amount owed because of questions as to the quality of Debtor's work. Specifically, the Agreement provided that the "[Defendant] shall be entitled to immediate and full recourse against [Debtor] and to demand payment with respect to an [account receivable] for the full Purchase Price paid therefore by [Defendant] plus [Defendant's] Fee in all instances, if payment is not received in full within 120 days of invoice date, except if payments [were] not received as a result of the 'Insolvency' of an account debtor."

G.  Recourse to the Debtor was also authorized under the following additional circumstances: (i) a dispute pertaining to an account receivable arose between Debtor and an account debtor, regardless of the validity of such dispute, or an account debtor alleged a claim of loss or offset of any kind regardless of the validity of such claim or offset; (ii) payment in whole or in part of an invoice was delivered by an account debtor to any person or entity other than Defendant; or (iii) Debtor breached any warranty, representation, or covenant in the Agreement or any agreement with Defendant.

H.  Defendant had the right to chargeback to Debtor any account receivable not paid within 120 days of invoice date. Additionally, Defendant had the right to settle any disputed account directly with the account debtor, which settlement would not relieve Debtor from responsibility for full payment of such account.

I.  Debtor granted, as security for its obligations under the Agreement, a security interest in its property.

J.  Debtor indemnified and held Defendant harmless against all liability, claim, demand, and damages arising from execution of the Agreement.

6. Defendant did not file a financing statement with respect to its security interest.

7. On January 23, 2004 (the "Filing Date"), Debtor filed a petition under Chapter 11 of the Bankruptcy Code.

8. After the Filing Date, Defendant continued to collect Debtor's pre-petition accounts receivable and applied the funds to satisfy Debtor's prepetition debt owed to Defendant. Also, after the Filing Date and until May 18, 2004, Defendant collected Debtor's post-petition accounts receivable and setoff the funds against advances made after the Filing Date to Debtor.

9. On May 18, 2004, the Bankruptcy Court entered a Stipulation and Consent Order Authorizing Post-Petition Financing and Use of Cash Collateral and for other related relief (the "May 18, 2004 Order").

10. The May 18, 2004 Order approved execution of a new Agreement between Defendant and Debtor (the "Post-Petition Agreement"). The Post-Petition Agreement was identical to the Agreement, with the exception of the reduction in Defendant's fee.

11. The May 18, 2004 Order did not authorize sale of Debtor's property, nor was there any reference to a sale of the accounts under 11 U.S.C. § 363(b). Rather, the May 18, 2004 Order approved only the use of financing under 11 U.S.C. § 364, and provided Defendant with a first priority lien and security interest in all of Debtor's property in order to secure the repayment of any obligations owing under the Post-Petition Agreement.

12. On August 12, 2005, the Bankruptcy Court entered an Order Directing the Appointment of a Chapter 11 Trustee; thereafter, on August 16, 2005, the Trustee was appointed Chapter 11 Trustee for Debtor's bankruptcy estate.

13. On October 18, 2005, the Bankruptcy Court entered an Order Converting Debtor's Bankruptcy Case to Chapter 7; thereafter, on October 19, 2005, the Trustee was appointed Chapter 7 Trustee for Debtor's bankruptcy estate.

14. On November 9, 2005, the Trustee filed an Adversary Complaint against Defendant.

15. On January 26, 2007, the Trustee filed an Amended Verified Complaint against Defendant.

16. In Counts I and IV, the Trustee seeks, under 11 U.S.C. § 547, the avoidance and recovery of preferential transfers made to Defendant under the Agreement.

17. In Counts II through IV, the Trustee seeks, under 11 U.S.C. § 548(a)(1), the avoidance and recovery of fraudulent transfers made to Defendant under the Agreement.

18. In Count V, the Trustee alleges, under the common law theory of deepening insolvency, that Defendant's actions caused Debtor to incur material operating losses and a diminution of assets to the detriment of Debtor's estate and its creditors.

19. In Count VIII, the Trustee alleges that he is entitled to the payment of reasonable attorneys' fees.

20. In Count IX, the Trustee seeks payment under accounts between Debtor and Defendant.

21. In Count X, the Trustee seeks the avoidance and recovery, under 11 U.S.C. §§ 549 and 550, of unauthorized post-petition transfers made on account of Debtor's pre-petition accounts receivable and made on account of Debtor's post-petition accounts receivable.

22. In Count XI, the Trustee seeks the avoidance and recovery, under 11 U.S.C.

§ 553(b), of certain amounts setoff during the 90 period preceding the Filing Date.

23.    In Count XII, the Trustee alleges that Defendant breached, in several ways, the May 18, 2004 Order and the Post-Petition Agreement.

24.    In Count XIII, the Trustee alleges that Defendant willfully violated the automatic stay.

25.    In Count XIV, the Trustee alleges that Defendant is not entitled to an allowed claim against the estate.

26.    In Count XV, the Trustee alleges that any claim to which Defendant is entitled must be equitably subordinated under 11 U.S.C. § 510(c).

27.    In Count XVI, the Trustee seeks payment of fees and expenses associated with the collection of Debtor's accounts receivable pursuant to 11 U.S.C. § 506(c).

28.    Defendant filed a motion for partial summary judgment dated February 7, 2007 seeking the entry of an order (i) determining that the transactions undertaken by the parties pursuant to the Agreement were true sales, and (ii) dismissing Counts I, II, III, IV, VI, VII, X, XI, and XVI[3] of the Amended Complaint. By submission dated February 22, 2007, the Trustee filed opposition and cross-moved for partial summary judgment, declaring that the transactions at issue constituted a loan.

---

[3] At oral argument, the parties agreed that Counts VI and VII were moot as having been previously resolved, and thus the Court will dismiss these Counts. With respect to Count XVI, the parties acknowledged at oral argument that the Trustee had not submitted a detailed itemization of actions taken with respect to the collection of the accounts receivable or costs associated therewith, and thus the Court is without sufficient information to evaluate the extent of any direct benefit bestowed upon Defendant. The cross-motions for summary judgment on this Count will be denied.

**IV.    DISCUSSION**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine issue for trial." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Once the moving party establishes the absence of a genuine issue of material fact, however, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. Matsushita, 475 U.S. at 587.

As previously noted, both parties have stipulated that there are no material issues of fact which would bear upon the issues presented to the Court or would be necessary for the Court to consider in deciding these motions. Simply put, the Court is faced with the question of whether the Factored Accounts, and the proceeds thereof paid to the Defendant, constituted property of the bankruptcy estate. Stated differently, did the Debtor's transfer of the Factored Accounts

9

represent a "true sale" of the accounts, or a loan from Defendant secured by the accounts and other assets of the Debtor. The starting point for the Court's analysis begins with the provisions of Article 9 of the Uniform Commercial Code ("UCC"), as adopted in New Jersey, which encompass both sales of accounts receivables and security interests in receivables. N.J.S.A. § 12A:9-109(a)(1) and (3). In this regard, Comment 4 of the official commentary to § 9-109 states:

> 4. Sales of Accounts, Chattel Paper, Payment Intangibles, Promissory Notes, and Other Receivables. Under subsection (a)(3), as under former Section 9-102, this Article applies to sales of accounts and chattel paper. This approach generally has been successful in avoiding difficult problems of distinguishing between transactions in which a receivable secures an obligation and those in which the receivable has been sold outright. In many commercial financing transactions the distinction is blurred.
>
> Subsection (a)(3) expands the scope of this Article by including the sale of a "payment intangible" (defined in Section 9-102 as "a general intangible under which the account debtor's principal obligation is a monetary obligation") and a "promissory note" (also defined in Section 9-102). To a considerable extent, this Article affords these transactions treatment identical to that given sales of accounts and chattel paper. In some respects, however, sales of payment intangibles and promissory notes are treated differently from sales of other receivables. See, e.g., Sections 9-309 (automatic perfection upon attachment), 9-408 (effect of restrictions on assignment). By virtue of the expanded definition of "account" (defined in Section 9-102), this Article now covers sales of (and other security interests in) "health-care-insurance receivables" (also defined in Section 9-102). Although this Article occasionally distinguishes between outright sales of receivables and sales that secure an obligation, neither this Article nor the definition of "security interest" (Section 1-201(37)) delineates how a particular transaction is to be classified. That issue is left to the courts.

(Emphasis added). Yet, notwithstanding that the UCC provisions apply to both sales and security transfers of account receivables, the UCC does not address or provide guidance on the

sale/financing characterization. Indeed, Comment 5 to § 9-109 makes it clear that the applicability of Article 9 to the sales of accounts is wholly irrelevant to any determination as to whether a particular transaction is to be deemed a sale or the creation of a security interest securing a loan:

> 5. Transfer of Ownership in Sales of Receivables. A "sale" of an account, chattel paper, a promissory note, or a payment intangible includes a sale of a right in the receivable, such as a sale of a participation interest. The term also includes the sale of an enforcement right. For example, a "[p]erson entitled to enforce" a negotiable promissory note (Section 3-301) may sell its ownership rights in the instrument. See Section 3-203, Comment 1 ("Ownership rights in instruments may be determined by principles of the law of property, independent of Article 3, which do not depend upon whether the instrument was transferred under Section 3-203."). Also, the right under Section 3-309 to enforce a lost, destroyed, or stolen negotiable promissory note may be sold to a purchaser who could enforce that right by causing the seller to provide the proof required under that section. This Article rejects decisions reaching a contrary result, e.g. Nothing in this section or any other provision of Article 9 prevents the transfer of full and complete ownership of an account, chattel paper, an instrument, or a payment intangible in a transaction of sale. **However, as mentioned in Comment 4, neither this Article nor the definition of "security interest" in Section 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation. This Article applies to both types of transactions. The principal effect of this coverage is to apply this Article's perfection and priority rules to these sales transactions. Use of terminology such as "security interest," "debtor," and "collateral" is merely a drafting convention adopted to reach this end, and its use has no relevance to distinguishing sales from other transactions. See PEB Commentary No. 14.**
>
> Following a debtor's outright sale and transfer of ownership of a receivable, the debtor-seller retains no legal or equitable rights in the receivable that has been sold. See Section 9-318(a). This is so whether or not the buyer's security interest is perfected. (A security interest arising from the sale of a promissory note or payment intangible is perfected upon attachment without further action. See Section 9-309.) However, if the buyer's interest in accounts or

11

>   chattel paper is unperfected, a subsequent lien creditor, perfected
>   secured party, or qualified buyer can reach the sold receivable and
>   achieve priority over (or take free of) the buyer's unperfected
>   security interest under Section 9-317. This is so not because the
>   seller of a receivable retains rights in the property sold; it does not.
>   Nor is this so because the seller of a receivable is a "debtor" and
>   the buyer of a receivable is a "secured party" under this Article
>   (they are). It is so for the simple reason that Sections 9-318(b), 9-
>   317, and 9-322 make it so, as did former Sections 9-301 and 9-312.
>   Because the buyer's security interest is unperfected, for purposes of
>   determining the rights of creditors of and purchasers for value
>   from the debtor-seller, under Section 9-318(b) the debtor-seller is
>   deemed to have the rights and title it sold. Section 9-317 subjects
>   the buyer's unperfected interest in accounts and chattel paper to
>   that of the debtor-seller's lien creditor and other persons who
>   qualify under that section.

(Emphasis added). See also Comment 2 to § 9-318 ("Neither this Article nor the definition of 'security interest' in § 1-201 provides rules for distinguishing sales transactions from those that create a security interest securing an obligation"). As a result, this Court must seek guidance outside of the UCC and examine the judicially created criteria, as applied to the parties' practices, objectives and expectations, in characterizing the transactions at issue.

The Courts have developed a series of factors to be employed in determining whether assets transfers are "true sales" or transfers of collateral in connection with secured financing. An excellent analysis and overview of applicable case law can be found in an article by Robert D. Aicher & William J. Fellerhoff, titled Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor, 65 Am. Bankr. L.J. 181 (1991) (hereinafter, "Aicher & Fellerhoff"), cited by both parties in their submissions to the Court. The factors identified by various courts to find that a sale of receivables is in reality a loan are:

1. Language of the documents and conduct of the parties.

2. Recourse to the seller.

    3.      Seller's retention of servicing and commingling of proceeds.

    4.      Purchasers failure to investigate the credit of the account debtor.

    5.      Seller's right to excess collections.

    6.      Purchaser's right to alter pricing terms.

    7.      Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.

    8.      Seller's retention of right to repurchase asset.

Aicher & Fellerhoff, supra, 65 Am. Bankr. L. J. at 186-194; See also Lois R. Lupica, Revised Article 9, Securitization Transactions and the Bankruptcy Dynamic, 9 Am. Bankr. Inst. L. Rev. 287, n49 (2001) (citing Fireman's Fund Ins. Cos. v. Grover (In re Woodson Co.), 813 F.2d 266, 272 (9th Cir. 1987) (Concluding that transferor retention of risk, coupled with lending interest rate, suggested loan, rather than sale); Bear v. Coben (In re Golden Plan of California, Inc.), 829 F.2d 705, 707, 710 (9th Cir. 1986); Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 542-44 (3d Cir. 1979) (Describing factors relevant to determination of existence of true sale); In re Coronet Capital Co., 142 B.R. 78 (Bankr. S.D.N.Y. 1992) (Describing instance where transfer was loan due to transferee's payment of interest to purchasers of interests, notwithstanding transferor's default); In re Evergreen Valley Resort, Inc., 23 B.R. 659 (Bankr. D. Me. 1982) (Finding transfer was security interest due to debtor's retained interest); First Nat'l Bank of Louisville v. Hurricane Elkhorn Coal Corp. II (In re Hurricane Elkhorn Coal Corp. II), 19 B.R. 609 (Bankr. W.D. Ky. 1982) (Describing instance where transfer was security interest because of debtor's retained interest); Federated Dep't Stores, Inc. v. Comm'r, 51 T.C. 500, 511 (1968), aff'd, 426 F.2d 417 (6th Cir. 1970) (Concluding that because transferor retained some risk, transfer was deemed to be loan)).

Although several courts have analyzed each of the above elements individually, no one element should be dispositive of what constitutes either a "true sale" or a transfer of collateral. See e.g. Major's Furniture Mart, Inc. v. Castle Credit Corp., supra, 602 F.2d at 544 ("The question for the court then is whether the nature of the recourse, **and the true nature of the transaction**, are such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing transaction or to a sale"). Rather, a judicially made determination should be based on the totality of the circumstances involving the transaction at issue. Therefore, this Court will look to all of the enumerated factors in rendering its decision.

### 1. Language of the documents and conduct of the parties.

At the outset, the Court notes that the May 18, 2004 Order has little, if any, evidentiary value, and offers the Court little guidance. The Order employs mixed and inconsistent terminology, and is replete with both "sale" and "loan" references from which both parties could seek support for their arguments. Thus, instead of construing the language and intent of the parties, as arguably embodied in the May 18, 2007 Order, the Court looks to the language of the Master Purchase and Sale Agreement (the "Agreement") to glean the intent of the parties. In this case, it is undisputed that the Agreement, entered into on August 22, 2003, governs the Factoring Agreement(s) and reflects the parties relationship and treatment of the transactions as "sales," prior to the filing of the bankruptcy proceeding. The language of that Agreement makes repeated references to "purchases" and "sales" of the Debtor's account receivables. Nowhere does the Agreement mention that the arrangement between the parties was to be considered a loan or series of loans. Moreover, for each account sold, the Agreement provides that the Debtor sold, transferred, and assigned all of its right, title and interest in the Factored Account to the Defendant. Such action is consistent with a "true sale" rather than a loan. Therefore, based on

14

the language of the Agreement, the Court regards this factor as weighing decidely in favor of treating the transactions as "true sales" of the Debtor's accounts receivable.

**2.    Recourse to the seller.**

With respect to recourse, it is clear that the Defendant has recourse to the Debtor under the Agreement in the following instances:

> 1. If payment was not received from the account debtor within 120 days of the invoice date.[4]
>
> 2. If there was a dispute pertaining to an account receivable arising between the Debtor and an account debtor, regardless of the validity of such dispute, or if an account debtor alleged a claim of loss or offset of any kind regardless of the validity of such claim or offset.
>
> 3. If payment in whole or in part of an invoice was delivered by an account debtor to any person or entity other than the Defendant.
>
> 4. If the Debtor breached any warranty, representation, or covenant in the Agreement or any agreement with the Defendant.

See Agreement, at ¶7.  Furthermore, the Debtor agreed to indemnify and hold the Defendant

---

[4] The Agreement contemplates a potential chargeback to the Debtor. That section states:

> Chargeback. In the event any Approved Account is not paid within 120 days of invoice date for any reason whatsoever except for the account debtor's Insolvency, [the Defendant] shall have the right to chargeback such Approved Account for [the Debtor]. No chargeback shall be deemed a reassignment to [the Debtor] of the Approved Account involved. [The Debtor] hereby acknowledges that all amounts chargeable to [the Debtor's] account hereunder shall be payable on demand by [the Debtor] to [the Defendant].

See Agreement, at ¶8.

harmless against all liability, claim, demand, and damages arising from execution of the Agreement. Id. at ¶17. Despite the fact that the Defendant accepted some of the risk of non-payment in the event of insolvency by an account debtor, it is evident from these terms that a substantial amount of risk was placed upon the Debtor. Thus, the Court weighs this factor in favor of a loan.

### 3. Seller's retention of servicing and commingling of proceeds.

Under the Agreement, the Debtor did not retain servicing rights or obligations with regard to the debtor accounts. Rather, the Debtor provided Defendant with an assignment, invoice, or similar proof of the amount due from the account debtor in connection with each purchase, and then either the Debtor or the Defendant forwarded a letter notifying the account debtor of the sale and directing the account debtor to pay Defendant directly. Thus, third parties were advised to treat the Defendant as the owner of the Factored Account, authorized to receive and retain payment. Moreover, the Defendant was empowered to: (1) settle any disputed account directly with the account debtor, which settlement would not relieve the Debtor from responsibility for full payment of such account, and (2) endorse the Debtor's name on checks forwarded to the Defendant on Factored Accounts, and to deposit same into Defendant's account. See Agreement, at ¶¶9&13. Furthermore, all payments which the Debtor received from an account debtor on a Factored Account were to be held in trust for the Defendant and had to be turned over immediately. Id. at ¶11. Given these terms, it is evident that the Defendant possessed broad power to service the Factored Accounts. Additionally, because the terms of the Agreement segregated any monies collected by the Debtor from an account debtor, the seller's commingling of proceeds is not at issue. In light of the Agreement, therefore, the Court holds that this factor weighs heavily in favor of finding the transactions to be "true sales" of the

16

Factored Accounts.

**4.     Purchasers failure to investigate the credit of the account debtor.**

Pursuant to the Agreement between the Debtor and the Defendant, the Debtor was required to represent that "[t]o the best of [Debtor's] knowledge, each customer of [Debtor] for which [Debtor] seeks [Defendant] to purchase an invoice is solvent and [Debtor] has provided and will continue to provide to [Defendant] all documents and information available to [Debtor] concerning the business and creditworthiness of such account debtor." See Agreement, at ¶6(b). Additionally, the Debtor was required to "represent an accurate and undisputed statement of indebtedness owed to [Debtor] by an account debtor for a sum certain without offset, defense or counterclaim...." Id. at 6(d). Given the fact that the Debtor was required to make the above representations pursuant to the Agreement, any "duty" that the Defendant may have had to investigate the credit of the account debtor becomes moot. Rather, the parties clearly agreed that it was the Debtor's responsibility to represent that the account debtors were solvent. Therefore, this factor weighs in favor of neither a loan nor sale of the Factored Accounts.

**5.     Seller's right to excess collections.**

The Agreement between the Debtor and the Defendant makes no mention of excess collections. Rather, the Agreement provides:

> Collection. Upon collection by [the Defendant] of an Approved Account, in whole or in part, [the Defendant] shall be entitled to receive [the Defendant's] Fee. The fee earned by [the Defendant] for purchasing an Approved Account is a percent of the face amount of the Approved Account purchased and shall be taken at the time of collection of an invoice...

See Agreement, at ¶4. Because the Agreement clearly does not indicate whether the Debtor is entitled to excess collections, this factor shall not be determinative of whether the Agreement

constitutes a sale or a loan.

**6.     Purchaser's right to alter pricing terms.**

The Agreement at issue does not set forth a mechanism in which the Defendant could alter, unilaterally or otherwise, the pricing terms of the Factored Accounts. Therefore, this factor weighs in favor of a treating the transactions as "true sales" of the Factored Accounts.

**7.     Seller's retention of right to alter or compromise unilaterally the terms of the transferred assets.**

The Agreement clearly provides that the seller may not unilaterally alter or compromise the terms of the Factored Accounts. Specifically, the Agreement states:

> l. [Debtor] shall not alter, modify or extend in any manner the terms of the original account with an account debtor, including but not limited to the maximum credit limit or the time within which payment is to be made, without first obtaining [the Defendant's] written consent to such change.

See Agreement, at ¶6(l). Consequently, the fact that the Debtor must first obtain the Defendant's consent before altering a Factored Account strongly suggests that the Agreement contemplates "true sales" and not a loan.

**8.     Seller's retention of right to repurchase asset(s).**

The Agreement at issue does not consider the Debtor's right to repurchase assets. Therefore, this factor shall weigh in favor of a neither a loan nor a sale.

**IV. CONCLUSION**

Application of the foregoing criteria to the case *sub judice* produces a tally which is decidedly in favor of treating the factoring arrangement as "true sales" of the Factored Accounts, rather than as a loan transaction. Accordingly, the Defendant's motion for partial summary

18

judgment is granted and the Trustee's cross motion for partial summary judgment is denied.

Appropriate Orders will be entered.


Dated: March 28, 2007

/s/ Michael B. Kaplan
Honorable Michael B. Kaplan
United States Bankruptcy Judge